## MANCHESTER & KEENE RAILROAD v. KEENE.

A condition in a vote of a municipal corporation granting aid in the construction of a railroad, that it shall be payable when the road is completed for use, is complied with when the road is constructed so as to be reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities.

Payment or tender of the damages awarded to the land-owner is a condition precedent to the right to enter upon the land for the construction of a railroad, but the condition, being for the benefit of the land-owner, may be waived by him.

So, also, the statutory provision for security for the payment of the damages, which may be awarded on appeal, may be waived by the land-owner.

Such waiver, although it deprives the land-owner of the right to dispossess the railroad or interfere with its operation, does not deprive him of the right to recover damages by an appropriate remedy.

The mission to make due compensation for land taken for the construction of a railroad can be taken advantage of by the land-owner only, and if he assents to an entry upon the land by the railroad under such circumstances as to waive the right to dispossess it, the omission to make such compensation is not a defence to an action brought to recover a sum voted by a municipal corporation in aid of the railroad, and payable when the road is completed for use.

ASSUMPSIT, to recover a gratuity voted in aid of the construction of the plaintiffs' railroad. Facts found by referees. At a legal meeting of the voters of the city of Keene, November 7, 1874, it was voted, by a majority exceeding two thirds, as follows: That the city of Keene raise by loan, for a term not exceeding thirty years, a sum equal to three per cent. of the last valuation of said city as made by the assessors, and appropriate the same as a gratuity to the Manchester & Keene Railroad, to aid in the construction of that part of said road lying between Greenfield and Keene, provided that no part of said sum shall be expended until the city councils of said Keene shall have satisfactory evidence that said road shall be completed between said Greenfield and Keene in a reasonable time thereafter, and provided further, that the bonds issued shall bear interest at six per cent., with coupons payable semi-annually. At said meeting it was also voted,—That the clerk of this meeting be instructed to·furnish without delay a certified copy of the vote passed here this day, granting a gratuity to the Manchester & Keene Railroad, to the city councils of Keene. The record does not show either that the last vote was adopted by a two-thirds vote, or that any one opposed its adoption. On the same day the clerk of the meeting furnished a certified copy of the first vote to the city councils of Keene.

December 11, 1874, the city councils of Keene, by a majority exceeding two thirds in each branch, passed the following joint resolution, which was approved by the mayor on the same day:

"City of Keene, in the year of our Lord, 1874: A joint resolution to carry out the popular will, as expressed by the legal voters of the city of Keene. by a majority exceeding a two-thirds vote, at a legal meeting held on the 7th day of November, A. D. 1874.

"*Resolved*, by the city councils of the city of Keene as follows: That a sum equal to three per cent. on the last property valuation of the city of Keene, as made by the assessors thereof, be raised and appropriated as a gratuity to the Manchester & Keene Railroad Company, to aid in the construction of that part of said railroad which shall be laid out and established between Greenfield in the county of Hillsborough, and the terminus at the city of Keene, and such sum is hereby appropriated for that purpose, provided that no part of said sum shall be paid in money or bonds, or be liable to be paid as aforesaid, to said railroad company, until said road shall be completed for use from said Greenfield to said Keene, or until the city councils shall have satisfactory guaranty from responsible persons that it will be so completed on or before the first day of December, A. D. 1878, and the councils shall so determine by a joint resolution. And the said city hereby reserves to itself the right to pay said gratuity in bonds of the said city, like as hereinafter described, to be taken by said railroad at par, in discharge of this obligation.

"*Resolved further*, That in order to meet the foregoing obliga-

tion of the city, the bonds of the city, in sums of one hundred, two hundred, three hundred, five hundred, and one thousand dollars, respectively signed by the mayor and president of the council, and countersigned by the treasurer of the city, shall be issued at par, with interest coupons attached at the rate of six per cent. per annum, payable semi-annually, the principal in said bonds to be made payable at such respective times that the whole amount of the sum so appropriated shall be payable in not more than thirty years, and at least three per cent. of said sum be payable annually, commencing with the third year after the issuing of said bonds."

Said votes of said city were simultaneously notified to the plaintiff company. The directors of said company voted, December 28, 1874, to accept the gratuity voted to that railroad by the city of Keene; and also voted that the treasurer be instructed to notify the city councils of Keene that the board of directors of the Manchester & Keene Railroad have this day accepted the vote passed by them, granting three per cent. of the valuation as made by the assessors thereof for the year 1874, as a gratuity to the Manchester & Keene Railroad. Notice of such acceptance was, on January 2, 1875, given to the city councils.

April 29, 1876, the plaintiffs made a contract with Richardson & Gallison for the construction of the road. They worked on the entire line under the contract from May to September, 1876, when they failed, and the contract was declared forfeited in October, 1876. The road was completed from Greenfield to Hancock Centre, a distance of about eight miles, between May, 1877, and January, 1878, under a contract with John H. Dawe. April 4, 1878, the plaintiffs contracted with Dawe & Bonnallie for the construction of the road from Hancock Centre to its terminus in Keene, a distance of about 22 miles, to be completed on or before December 1, 1878, for $683,196.31, of which sum $128,951.58 was payable by an assignment of the Keene gratuity, $250,000 in stock of the plaintiff company, and $230,000 in bonds of the plaintiff company, and the balance in sundry other items equal to cash. On the same day (April 4, 1878), as provided by the contract, the plaintiffs assigned the gratuity, voted by the defendants, to Dawe & Bonnallie, and the assignment was filed in the clerk's office of the city of Keene, April 5, 1878. Between April 4, 1878, and October 10, 1878, Dawe & Bonnallie assigned to S. W. Hale, Henry Colony, John Y. Scruton, Wm. P. Frye, A. & W. Dickinson, and A. W. Eames, the whole of said gratuity as collateral security. The assignments were seasonably filed in the office of the city clerk of Keene, and this suit is prosecuted by the assignees, and the plaintiff corporation has now no substantial interest in said gratuity or in this suit. Dawe & Bonnallie proceeded to construct the road, under said contract, relying upon said gratuity as part payment. The rails were connected from Greenfield to the terminus in Keene, and a trial train run over the whole of the same November 30, 1878.

A majority of the referees find that on the first day of December, 1878, the railroad of the plaintiff corporation was constructed from Greenfield to the terminus in Keene, and was reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities. Upon the foregoing facts a majority of the referees find that the railroad from Greenfield to the terminus in Keene was completed for use on the first day of December, 1878.

The defendants claimed that the words "completed for use" in the resolution of the city councils have the same force and meaning as the simple word "completed" would have, and requested the referees to report the facts bearing upon that construction, which are as follows:

December 1, 1878, there were only about eleven miles of fencing on the line of the road, and it was estimated that it required about $8,600 to finish the fencing. There was no depot at West Harrisville, and only a rough board structure at Harrisville. The cost of building suitable depots at said places was estimated at $1,900. There were no turn-tables, or other terminal facilities other than those used, which belonged to connecting roads. A certain amount of timber was required in the trestles to complete the same according to the original plan. The track was somewhat out of line and surface at some of the approaches to the trestles. Some cuts were one to one, and some a little steeper. Many fills were not up to grade, and the banks were generally slack. Land damages to the amount of $881, representing 6,431 lineal feet out of 29½ miles, were and still are unpaid, but were all assessed, and the amounts assessed tendered in all cases except one, and in that case the damages were agreed on, and a partial payment made. No land-owner has attempted or threatened to disturb the possession of the plaintiffs, or objected to the plaintiffs' occupying the land taken for the road. No part of the above unpaid damages has been deposited with the state treasurer. There was no evidence of express waiver, but from these facts the referees find that the unpaid land-owners have waived their right to dispossess the plaintiffs. Many of the cuts were left narrow, and without ditches. For considerable distances there was no ballast between the ties, and at some points the ties were not tamped, and at some few places the ends of the ties extended beyond the embankments. The ends of the trestles where they joined the embankments had settled, and were liable to settle more. In one place, the new embankment had crowded the trestle, so that some of the bents were out of plumb and line. There are three trestles designed hereafter to be filled with earth, and other trestles which may hereafter be so filled. The referees find that the sum of $20,000 would have made good all of said deficiencies, including fences and depots, and exclusive of filling the trestles; and the referees find that the construction of said trestles in place of embankments of

earth was not a deficiency. If the defendants' contention as to the construction to be given to the words "completed for use" is right, then the referees find that said railroad was not completed for use on the first day of December, 1878.

December 5, 1878, the plaintiff company notified the defendants that the road was completed for use, and demanded payment of the gratuity voted as aforesaid. January 2, 1879, the city councils of Keene, in reply to said demand, directed the mayor to reply that the councils " believe the road was not completed on the first day of December, 1878, and that it is not now completed ; and for this, and other reasons, we must therefore respectfully decline to grant the request for a gratuity." This vote was approved by the mayor, and was notified to the plaintiff company, but it does not appear by the records that it passed by a two-thirds vote, or that any one dissented.

In the month of December, 1878, the plaintiff company and Dawe & Bonnallie became insolvent, and have so remained. The road was operated from December 1, 1878, until the end of February, 1879. During that time the road was allowed to deteriorate, and was not operated from March 1, 1879, until September 1, 1880. From September 1, 1880, it has been operated by the trustees appointed by the court in August, 1880. From December 1, 1878, to March 1, 1879, the receipts from operating the road were about $1,900, and the expenses about $3,000. From September 1, 1880, to March 1, 1881, the receipts from operating the road were $10,240.02, and the expenses were $16,859.59. The evidence as to the receipts and expenditures from September 1, 1880, to March 1, 1881, was put in by the defendants, and afterwards the plaintiffs proved, and the referees find, that the road is not so run as to develop its business. The plaintiff corporation expended about $7,000 in 1879, in putting the road in order. In 1880, and prior to the reopening of the road, the plaintiffs in interest expended for masonry, ballasting, surfacing, track, etc., about $14,000 ; bridges and trestles, about $7,000 ; fencing, about $4,800 ; depots and buildings, about $1,500. Miscellaneous bills, including engineer. about $2,200.

The referees find that on the first day of September, 1880, said railroad from Greenfield to its terminus in Keene was completed for use, giving to the words " completed for use " the force and meaning contended for by the defendants, and that said road was so completed within a reasonable time from December 11, 1874. In determining what would be a reasonable time, the referees have considered only such facts as were known to both parties December 11, 1874, and the facts proved in this case without objection, and have held that a reasonable time included not only time for the actual labor of constructing the road, but the time which, at the date of the vote of the gratuity, the parties might have reasonably presumed would be needed to obtain funds to construct the road.

The road is now being operated by the trustees appointed by the court in August, 1880, who are indemnified by the plaintiffs in interest. The corporation has no money or other funds wherewith to pay land damages or procure rolling-stock, and has no rolling-stock or equipment except road-masters' equipment, and has no terminal facilities or turn-tables, but use those of connecting roads. At no time during the progress of the work has the city of Keene given the plaintiff corporation, or the plaintiffs in interest, any notice except as already stated, or by any corporate action expressed any dissatisfaction with the progress of the work. September 15, 1880, the plaintiff company, Dawe & Bonnallie, and the plaintiffs in interest, made a new request of the defendants for payment of the gratuity, with interest from December 5, 1878. The amount of the gratuity is $128,951.58.

The referees find that the defendants did promise the plaintiffs in manner and form as the plaintiffs have declared against them, and do award that the plaintiffs recover of the defendants the sum of one hundred twenty-eight thousand nine hundred and fifty-one dollars and fifty-eight cents ($128,951.58) and interest from December 5, 1878, or from September 15, 1880, according as the court shall hold upon the foregoing facts.

*W. E. Chandler* (with whom were *Briggs & Huse*), for the plaintiffs. "A majority of the referees find that on the first day of December, 1878, the railroad of the plaintiff corporation was constructed from Greenfield to the terminus in Keene, and was reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities. Upon the foregoing facts, a majority of the referees find that the railroad from Greenfield to the terminus in Keene was completed for use on the first day of December, 1878." If the majority of the referees had simply reported that the road was "completed for use," December 1, 1878, their decision would have been solely a finding of fact which the court would not revise. But they concluded that determining what kind of completion for use the contract with Keene fairly required was the decision of a question of law, and that finding that the completion was actually of the kind required settled a question of fact. In *Worcester Medical Institution* v. *Harding* and *Bigelow*, 11 Cush. 285, it was decided that the meaning of the phrase in a building contract, "when the walls shall be completed," "is a question of law for the court; and whether the necessary acts were done is a question for the jury." As matter of law, then, did the contract of Keene to pay the gratuity when the road should be "completed for use" from Greenfield to Keene, require any higher standard of completion than that adopted by a majority of the referees?

The plaintiffs contend that the requirement that the road should be "completed for use" meant only that it should be so con-

structed as to be capable of reasonably safe, fit, and convenient use for traffic, as has been usual and customary in the case of other new roads in similar localities when first used, and not that it should be brought to that perfect and final condition to which contractors, under specifications, might be required to bring it, and which railroads seldom, if ever, reach until months, and sometimes years, after they are put in operation.

The meaning proposed is that naturally to be derived from the words adopted. There being evidently different stages of completion of a railroad, the words " for use " were intentionally added to define the particular stage stipulated for,—that in which the road should be capable of use; meaning safe, suitable, and convenient use, and no more.

Such was the natural contract to be made between the city and the railroad company. The city was making a donation to get a new railroad opened to it. If the track should be laid, and the road be once made ready for operation, the city would be sure of all it desired ; for there would be no doubt that it would be opened and put in operation, and would continue to be run. No failure of these results ever was known in this state ; none was anticipated ; and none did the city care to provide, or actually provide, against.

The railroad company was to build its road on credit, by assigning to the contractors donations to come from municipalities. The contractors were also to build on credit, relying on prompt payment of such donations. To wait an indefinite period after the road should be opened, engaged in controversies as to what was completion, might bankrupt the company and contractors. Hence it was most natural to define completion as meaning suitable " for use," or " for operation," or to require that " the track should be laid," or the road " opened for traffic."

These have been the usual contracts in cases of municipal aid to railroads ; and no case can be found, of the hundreds in the reports, where there has been a condition for minute or final completion, or for a completion according to specifications.

In *Packard* v. *County Com'rs*, 2 Col. 338, the subscription was to be paid " $16,000 when one third the road-bed is graded; $17.000 when two thirds are graded ; and balance when entire road-bed is graded, with bridges and cross-ties provided."

In *Hodgman* v. *Chicago & St. Paul Railway Co.*, 20 Minn. 48 and 23 Minn. 153, the bonds were not to be issued " unless said railway shall be fully constructed, equipped, and put into successful operation for the transit of freight and passengers from St. Paul to said Red Wing, on or before January 1, 1871."

In *Johnson County* v. *Thayer*, 94 U. S. 631, the condition was that the company should " construct and put in operation " the railroad.

In *Moultrie* v. *Savings Bank*, 92 U. S. 631, the words are, that the bonds shall not be issued " until the said road shall be opened for traffic."

The Illinois statute authorized municipal aid to be " paid to said company as soon as the track of said road shall have been located and constructed through said city, town, or township respectively." See *Concord* v. *Savings Bank*, 92 U. S. 625.

In this way the cases proceed, with language varying more or less, requiring " completion," or completion " fit for operation," or " completion and operation," but in no single instance establishing a requirement as to condition of road which would not be satisfied by a finding that the road was reasonably safe, fit, and convenient for the public use and accommodation, as new roads are ordinarily used in similar localities.

The question of completion, within the meaning of contracts, having been usually treated as a question of fact, there are few reported decisions to aid in determining the true legal standard of " completion for use " in this case.

In *Ogden* v. *Kirby*, 79 Illinois 555, a subscription was payable provided the railroad should be completed and in operation to Menominee by July 1, 1872; and it was held that the question when the road was completed and in operation was purely a question of fact for the jury. But the presiding judge having instructed the jury to render a verdict for the defendant unless the railroad, on or before July 1, 1872, afforded at Menominee reasonable facilities to the public, both as to passenger business and freight business, to receive and discharge the same, the court held the instructions erroneous. *Craig*, J., says,—" The question . . . was foreign to the inquiry. It is a fact which falls under the observation of every one, that a new road but recently completed cannot afford the facilities for receiving and discharging freight and passengers that can be afforded by a road that has an established business, and has had the time and means to construct depots, freight-houses, and the various buildings necessary to facilitate and accommodate the travel and commerce of the country ; and yet, by the instructions, the jury were told that unless reasonable facilities were shown, the road could not be considered in operation. Reasonable facilities, we presume, would mean such as were ordinarily afforded by the established railroads of the country. This road was required to be completed on the first day of July, 1872. These instructions required its facilities on the day of its completion to equal those of established roads ; and the jury, under the instructions, did not even have the right to take into consideration the age of the road and the condition of the country through which it was constructed." The jury had also been instructed, that if they found that the road, on July 1, 1872, had no agent at Menominee, and that the only regular trains then running to Menominee were freight trains running to lumber mills there, they should find for the defendant; and these instructions were held erroneous. *Craig*, J., says,—" It was the province of the jury, and not of the court, to determine what constituted the operation of the road. It

was a question of fact, and not of law; and yet, notwithstanding this, one fact is singled out by the instructions, and the jury are directed that the existence of that fact, as a matter of law, does not constitute the operation of the road. If freight cars were run over the road prior to July 1, 1872, to the village of Menominee, and delivered freight, as was established by evidence, this was a fact proper for the consideration of the jury, tending to prove that the road was in operation at that time; and the appellants were entitled to the full benefit of this fact before the jury in their deliberations. The instruction, however, took the consideration of this fact from the jury."

In *Hodgman* v. *Chicago & St. Paul Railway Co.*, 20 Minn. 48, above referred to, there was, on January 1, 1871, a substantial gap or break in the road, which continued until December, 1871, and there was also no bridge over the Mississippi; and an injunction was granted against the issue of the bonds. In 23 Minn. 158, this decision was reversed on appeal; and it was held, that the vote "did not require the company to construct a bridge at Hastings, but to provide such facilities for passing the river as at the time of making the contract were usual and customary under like circumstances in railroad transportation across said stream, and as were adequate and reasonably convenient in reference to such mode of transit." In *Worcester Medical Institution* v. *Harding* and *Bigelow*, 11 Cush. 285, "a subscription to build a medical college was payable, one third when the walls should be completed. Held, that such subscription was payable when the walls were so far completed as to receive the roof, although the walls had not then been covered with mastic, according to the complete designs of the building." Under the acts of congress of July, 1862, and July, 1864, there were issued bonds of the United States to aid in the construction of a railroad to the Pacific coast as follows: To the Union Pacific Railroad Company, on 1,029 miles, $27,236,512; to the Central Pacific Railroad, on 881 miles, $25,885,120. The bonds were to be issued to the companies in instalments, as fast as twenty-mile sections of their roads should be completed; and after they were all so issued, a final examination of the roads was made by a commission of eminent citizens, appointed by special act of congress of April 10, 1869, who made a report to the secretary of the interior (published as Senate Exec. Doc., No. 90, 41st Cong., 2d Session), in which they find deficiencies on the Central Pacific road amounting to $576,650, and on the Union Pacific of $1,586,100. The deficiencies to be supplied included large sums for ballasting track, widening embankments, filling trestles, building and strengthening bridges, making permanent water-ways, replacing cottonwood ties, building engine-houses and machine shops, building freight and passenger depots, and correcting location and reducing grades.

The practical difference between a provisional and final com-

pletion, justifying the issue of all the bonds before or when the road was opened, was recognized by Mr. Attorney-General Evarts in an opinion given in 1869, published in the Opinions of the Attorneys-General. After the roads were opened, controversy arose between the companies and the United States, under the following clause in section 6 of the act of 1862: "After said road is completed, until said bonds and interest are paid, at least five percentum of the net earnings of said road shall also be annually applied to the payment thereof."

The question was, whether the obligation to commence paying the five per cent. to the United States took effect when the road was provisionally completed for use and the final deliveries of bonds made in 1869, or not until October 1, 1874, when another commission reported that the deficiencies above recited had been duly supplied, and that the road was fully and finally completed. The supreme court held that the companies, having applied for and received all the bonds from the United States on their claim of completion, were estopped to deny such completion for the purposes of the above section 6. But at no time was the delivery of $53,000,000 of bonds to the companies on or before the opening of the road censured or attacked. When the Central Pacific case was before the circuit court in California, *Sawyer*, J. (4 Sawy. C. C. 352) held, that the road was not completed, within the meaning of the five per cent. clause, until October 1, 1874. The following are extracts from his opinion: "To bring a railroad up to first-class, as a practical business proceeding, requires time after the mere laying of the rails." "Ordinary practical business economy requires temporary structures, to be gradually replaced as they become unfit for use, and ballasting to be a progressive work, affording time for the embankments to settle by use and to be rendered compact by rains." "The construction of this road was pushed forward with unprecedented energy and haste, for the purpose of getting it open for traffic. When this object was accomplished, the defendants subsequently acted upon sound, practical, economical business principles, and brought the road up to the standard required, by correcting locations, widening cuts and embankments, substituting permanent for temporary structures, ballasting, furnishing water stations, depots, sidings, equipments, etc., by degrees, in the same mode as the testimony shows is usual in the construction and equipment of other extensive first-class roads." "The road is, doubtless, better for being gradually brought to the required standard." "A very inferior road is capable of use, and sometimes of a profitable use." Mr. Justice *Bradley* delivered the opinion of the U. S. supreme court (*U. P. Railroad* v. *U. S.*, 99 U. S. 402, and *U. S.* v. *C. P. Railroad*, 99 U. S. 449), and there is taken therefrom the following: "*First*, When was the road completed? . . . In one sense a railroad is never completed. There is never, or hardly ever, a time when something more can-

not be done, and is not done, to render the most perfect road more complete than it was before. This fact is well exemplified by the history of the early railroads of the country. At first, many of them were constructed with a flat rail, or iron bar, laid on wooden string-pieces, resulting in what was known in former times as snake-heads—the bars becoming loose, and curving up in such a manner as to be caught by the cars and forced through the floors amongst the passengers. Then came the T rail; and finally the H rail, which itself passed through many successive improvements. Finally, steel rails in the place of iron rails have been adopted as the most perfect, durable, safe, and economical rails on extensive lines of road. Bridges were first made of wood, then of stone, then of stone and iron. Grades originally crossed, and in most cases do still cross, highways and other roads on the same level. The most improved plan is to have them, by means of bridges, pass over or under intersecting roads. A single track is all that is deemed necessary to begin with; but now no railroad of any pretensions is considered perfect until it has at least a double track. Depots and station-houses are at first mere sheds, which are deemed sufficient to answer the purpose of business. These are succeeded, as the means of the company admit, by commodious station- and freight-houses, of permanent and ornamental structure. And so the process of improvement goes on,—so that it is often a nice question to determine what is meant by a complete, first-class railroad; and if a question of right or obligation between parties depends upon the completion of such a structure, courts are obliged to spell out, from the circumstances of the case and the language and acts of the parties, what they mean when they use such terms."

Further to argue so plain a question, with such authorities cited, seems superfluous. What more can Keene fairly or possibly ask, than that the road shall be reasonably safe, fit, and convenient for the public use and accommodation? This was all Keene wished to accomplish as the object of her donation. The amount of her gratuity was fixed, and not to be increased or diminished according to the kind of road built. She laid down no specifications, made no condition even that the road should be operated, but only that it should be completed for use,—that is, fitted for operation,—paid no attention to the work during its construction, pointed out no defects, and never expressed any dissatisfaction with the road until it was in full operation, and then gave no details of complaint whatever. Where is the different standard of completion that she is entitled to set up now for the first time? It has never been defined in any explicit form of words, and cannot be, without exposing its unreasonableness. If it was enough to build a railroad reasonably safe, fit, and convenient for the public use and accommodation, it needs no argument to show that the qualifying words "as new railroads are ordinarily used in similar localities" were sound limitations. Do the defendants contend that under the Keene vote

the plaintiffs, to be entitled to the gratuity, were bound to have ready December 1, 1878, a new railroad with all the qualities of an old railroad, or that they were bound to provide a railroad suitable for other and different localities, as, for instance, a road as level as that along the Platte valley, or with as good a track as that between New York and Philadelphia, or Boston and Lowell, or the White House and the Elberon cottage? It is to be borne in mind, that the words "completed for use" are those of the city and not of the railroad company, and are therefore to be construed strictly against the former and liberally toward the latter. Keene might have added further words, and stipulated for any kind or standard or test of completion for use she chose, but she preferred to stand solely on those three words, and has never yet fairly stated what she contends they mean; and they are not therefore to be harshly construed to relieve her from a just liability, and to impoverish her creditors, who nearly three years ago fulfilled all obligations reasonably to be implied from the three words used.

The standard of completion which the plaintiffs believe to be just and fair, was stated in a printed brief submitted to the referees in the opening of the hearing, and was substantially the standard now contended for. The defendants' counsel really never set up any standard of completion, but contended that the referees must not hold that the words "completed for use" meant anything less than the word "completed" alone would mean; and they stood and still stand captiously contending that every specific, petty defect or deficiency, which they or their experts hunted up long after Keene's liability was fixed, prevents a "completion for use," and defeats a recovery. Those defects and deficiencies are stated in the referees' report. Did they prevent the road, on December 1, 1878, from being reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities? The referees find that they did not. Will the court overrule their finding of fact? Did these defects and deficiencies, as matter of law, require the adoption of a standard of completion for use different from that of the referees, to which they find this railroad, notwithstanding those defects and deficiencies, conformed? "The referees find that the sum of $20,000 would have made good all of said deficiencies, including fences and depots." The whole thirty miles of road cost $600,000. Are deficiencies, mainly for fences and depots, which $20,000 would overcome, fatal to "completion for use"? Was the road not completed for use, if there were no terminal facilities nor rolling-stock, when those of the connecting roads were used, and the road had been leased to a connecting road before construction, in pursuance of express statute authority? Was the road not completed for use, if there were $881 unpaid land damages on 6,431 feet out of 29½ miles of road, all duly assessed, and tendered in all cases but one,—the referees finding that the land-owners had waived any

right to interfere with the road, because they had never attempted or threatened to disturb it ?   (In *McAulay* v. *Western Vermont Railroad*, 33 Vt. 311, it was held, that although payment of land damages is a condition precedent, yet it is a condition for the benefit of the land-owner, and may be waived by him, even by parol ; and that where he acquiesces in the occupation of the land without prepayment, and the road is constructed and put in operation, he cannot afterwards maintain ejectment or trespass.)   Do the numberless freshets, slides, wash-outs, derailments, dilapidations, stoppages, insolvencies, controversies, losses, and other incidents historically connected with this railroad, which have all happened since the road was completed for use, December 1, 1878, and demand for payment made of Keene on the 5th of December, require any different standard of completion for use to be adopted by which to determine the liability of Keene on said 5th of December ?   To ask these questions is to answer them.

At the risk of repetition and prolixity, we restate the question. There can be but two methods of dealing with it.   One is to treat the question of " completion for use " as a pure question of fact, as the cases generally do.   Then the finding of the referees is conclusive on the whole case, and the court will not revise it.   The other is (like the court in 11 Cushing and the referees), to consider the meaning of the word " completed " in the contract as a question of law, and the question whether the necessary acts were done, one of fact.   Then the only question for the court is, whether the referees rightly interpreted the meaning of the words " completed for use."   If they did, and have found that the road was completed within that meaning, the court will approve their interpretation, accept their finding as conclusive, and render final judgment according to their award.

The referees clearly state their interpretation of the words " completed for use ; " that they meant that the road should be so constructed as to be " reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities."   That interpretation is sensible, just, correct, and sustained by reason and authority, as we have endeavored to show.   The plaintiffs promptly stated their view of the meaning of the words " completed for use : "   " that it should be so constructed as to be capable of safe use for traffic, as has been usual and customary in the case of other new roads when first used, and not that it should be brought to that perfect and final condition to which contractors, under specifications, might be required to bring it, and which railroads seldom if ever reach until months, and sometimes years, after they are put into operation."

The defendants stated their first view : That if the referees should decide that the road was completed for use, " and should adopt the view that the words ' for use,' in the resolution of the city councils, qualify the word ' completed ' in such a way that the

phrase ' completed for use ' is satisfied by a railroad less complete and perfect than would fairly answer to the term ' completed ' alone, then the defendants desire to have the condition of the road at the time it may be found to be ' completed for use ' stated sufficiently in detail, so that the construction of the resolution in this respect may be presented to the court. It then becomes a mixed question of law and fact,—law, so far as regards the interpretation of the language of the resolution, and fact, so far as regards the actual condition of the road. It is a question for the court whether the law is correctly applied to the facts." The defendants' second standard is as follows: " The road must be completed for use : not partially completed, so that the work of completion may be carried on and finished alongside a partial and precarious use for traffic. We do not mean, made to be a perfect railroad. No road probably was ever completed in that sense ; but we claim that it must be in a condition such that a fair man, of sound judgment and practical common-sense, one experienced in such things and having no interest in the result, would say it is a completed road, ready for use in the way railroads are ordinarily used for public traffic, the carrying of freight and passengers." The referees' definition of a road, " completed for use," rejects the negative portion of that of the plaintiffs, adds to the requirement of safety for use those of fitness and convenience, and limits the requisites to such as may be appropriate to the locality of the road. What do the referees omit which the defendants had a right to ask ?

The defendants' first standard is no standard at all. Their request is really this : If you think that " completion for use " is anything less than " completion " alone, and find the road to be completed, then report all the facts so that we may ask the court to revise your decision of fact and find the road to be not completed. To justify this demand, they say, "It then becomes a mixed question of law and fact." Suppose it does : it by no means follows, that, under an extremely indefinite and dangerous proposition that the court is then to decide " whether the law is correctly applied to the facts," the court will proceed, on the referees' report, to revise, and decide the other way, the intricate and contested questions of fact the evidence on which occupied three weeks' hearing ! Under such claim of a right to see that " the law is correctly applied to the facts," the court might easily control or reverse every verdict of a jury that is ever rendered. If the question before the referees was really a mixed one of law and fact, the court will look only to see whether the referees have fairly and candidly stated the legal principle by which they undertook to guide their action, and whether that principle appears to be sound and correct. If so, the court will not look closely into the facts, but will approve the finding of the referees that the facts made a case requiring their ultimate decision. The principle clearly stated by the referees was, that the contract required that the railroad should be

constructed so as to be " reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities." The defendants' first standard gives no suggestion that would enable the court to amend this principle, but only demands that they shall be furnished with the means of appealing from the decision of the referees on a " mixed question of law and fact"—that is, on both law and fact—to the court. But at last the defendants state something like a standard or principle, by which to determine, as matter of law, what would be " completion for use." We call attention to their second standard. (1) If a road is substantially completed, we say it is clearly sufficient, although it may not be in a final or perfect condition of completion ; that is, although it may be what counsel calls (but the referees do not call) partially completed for a partial and precarious use for traffic. There is great latitude in the meaning of adjectives. " Substantial " is the proper legal word by which to determine whether there was performance : substitute substantially for not partially, and substantial for partial and precarious. (2) Again : It is no concise and accurate definition of " completion for use " to say that it requires that the road must be " in a condition such that a fair man, of sound judgment and practical commonsense, one experienced in such things and having no interest in the result, would say it is completed." Those words merely demand good witnesses or a competent tribunal; but they can be no part of the true definition we are seeking : they make a confusion of ideas. (3) It must be conceded that the road was sufficiently " completed for use," if it was ready for public use as new roads are ordinarily used in similar localities. In their request for further findings, the defendants do not complain of the soundness of these qualifying words, only that the referees did not inform the counsel beforehand that they intended to use them. The defendants' second standard, revised and corrected, is, that the road must be completed for use—substantially completed, so that the work of final and perfect completion may be carried on and finished alongside a substantial use for traffic. We do not mean made to be a perfect railroad. No road probably was ever completed in that sense ; but we claim that it must be  .  .  .  a completed road, ready for use in the way new railroads are ordinarily used in similar localities for public traffic,—the carrying of freight and passengers. That is a good standard, equivalent to but not quite so concise as that the road must be " reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities." If it is possible to evolve, from all the obscurity with which the defendants' " mixed questions of law and fact " are stated, the conclusion that they do not object to the referees' standard, but only make what is in the nature of a motion for a new trial on the ground that the verdict was against the weight of the evidence, we submit that no such case of palpable

error is made out as would justify the interference of the court, even if a referee's report should ever be set aside on such grounds.

*W. S. Ladd*, for the defendants. In the plaintiffs' argument it is said,—"If there was any contract here at all, it was mutual, and bound both parties from the time the Keene vote was accepted by the company, and it began work on the road." We would like to know wherein the mutuality consists. What did it bind the Manchester & Keene Railroad Corporation to do? It is important to settle in the outset, if we can, what were the true legal relations established between the city and the railroad corporation by the passage of the resolution and the notification that it was accepted. If the statement above quoted from the plaintiffs' brief means anything, it must mean, so far as we can see, that the railroad corporation thereby came under a legal obligation to build the road, and Keene under an obligation to make them a gift of so much money when it was built. That would constitute a mutual contract · resting for its consideration upon mutual promises to be performed in the future. But that is not so. Such votes have never been looked at in that way by courts or law writers; and such was not the fact of the transaction. There was no stipulation on the part of the railroad corporation that they would build the road. They came under no legal obligation to do so. Keene could have maintained no action against them for an omission to do so. The whole significance of the vote accepting the gratuity was, as we submit, simply this,—that the railroad corporation would accept the gift with the condition imposed. We say the transaction wanted exactly what the plaintiffs say it had, namely, the element of mutuality, to make it a contract in the usual and ordinary acceptation of that term. It resembles much more a gift offered upon certain conditions, to go into effect on a future day, provided those conditions were performed.

Keene was not contracting for the building of a railroad. It could not lawfully have done so. The municipality was not to have any interest or property in the road when completed. It was simply the promise of a gift, to be consummated by delivery in case the railroad should choose to perform, and should perform, the conditions upon which it was offered, leaving the beneficiaries at full liberty to perform those conditions or not, as they chose. It makes no difference what this be called, if we only keep distinctly in mind what it really was. But if we call it a contract, and by the use of that word allow ourselves to confound it with a contract for the building of a house, or a ship, or a railroad, we shall lose sight of a vital distinction, and inevitably find ourselves applying legal principles in its interpretation which have no just or proper application, and which must therefore lead to grossly erroneous results. Was there an hour from the passage of the resolution to the time when the referees find the road was com-

pleted for use (September 1, 1880), when the railroad corporation could not have drawn back and said, "We go no further in the performance of this condition," without furnishing any cause of action to Keene for the breach of a contract? We suppose there can be but one answer to this question, namely, that there was not. Then does it not follow that it was a contract (if it was a contract at all) by which one of the parties was not bound to do, or to abstain from doing, any act or thing whatever? Where, then, is the absurdity of calling it a unilateral contract,—a contract under and by virtue of which the nature and extent of the rights and obligations of the parties were left wholly to the option of one of those parties?

A word further as to the character of this transaction. It is the appropriation of public money as a gift to promote an enterprise in almost every aspect private in its character. Scarcely a court have ever held that such a thing could be done without violating the constitution of the state where it was attempted, that have not given strong expression to their regret that they found themselves unable to hold the other way. "A system which puts the property of tax-paying citizens against their will into a railroad corporation is little better than confiscation. It has proved a calamity in most instances," says that very judicious writer, Mr. Pierce, after looking over and citing the cases on the subject decided by the American courts. Pierce R. R. 89. Judge Dillon, speaking of the same thing, says,—"Regarded in the light of its effects, however, there is little hesitation in affirming that this invention to aid private enterprises has proved itself baneful in the last degree." Dill. Mun. Cor., s. 104. This consideration furnishes no reason for denying these plaintiffs in interest their legal rights in this case. It does furnish a reason, however, against stretching, and distorting, and misapplying the well understood doctrines of law and equity, to enable them to recover against this municipal corporation money to which, upon a fair and reasonable interpretation and application of the law, they have no right. It furnishes a reason, if any were needed, why the idea that time is not usually of the essence of a contract should not be imported and misapplied where it has no just or proper application at all; and it furnishes a reason why the corporation should be held to a full and strict performance of the conditions precedent upon which the gift was voted before a recovery can be had.

The plaintiffs say time is not essential; or at any rate that, if the resolution contains any provision with respect to the time of completion of the road, it is not made an essential condition precedent. " Equity abhors penalties," &c. If A contracts with B to build a house for him for $3,000, and it is stipulated that it shall be done by a certain day, and when the day comes round the house is not quite but nearly completed, A shall not certainly and absolutely lose all he has done towards a performance which has been beneficial to B. So, if the proprietors of a railroad contract with

A to build a road for them, and it is stipulated that it shall be done by a certain day, the same doctrine would undoubtedly apply.   So, if a town enters into a lawful contract to take and pay for a certain amount of the stock of a railroad, and it is stipulated that the road shall be completed by a certain day, the same principle would apply.  But this is as far as the cases go.  The Missouri case, cited in the plaintiffs' brief (*Railroad* v. *Nodaway Co.*, 47 Mo. 349), goes just as far as the last supposition alone, and no further.   That was a contract to subscribe for stock in the road; and that contract contained no condition that the stock should be taken only in case the road should be completed by a given time. The plaintiffs' counsel happen to omit, in quoting from the case, the word which makes it utterly inapplicable in the present, and throws it clearly and fully into the category above.   The county, by its authorized agents, subscribed for 1250 shares of stock,— that is, made a contract, on behalf of the county, to take and pay for so many shares, to be paid for, so and so, in bonds of the county.  "And the subscription stipulated that said road should be finished to a point one mile from said court-house by May 1, 1870," &c.   This word "stipulated" puts an entirely different aspect on the case, so that it is not in conflict with the uniform and unbroken current of cases wherever this question has been at all considered.   The time for completion was not made a condition at all.   It is competent for a municipal corporation to make its subscription upon condition that the road shall be completed within a certain time, or upon such other condition as may be considered necessary or desirable, to insure the corporation against loss; and as between the parties such condition will be enforced. Jones Ry. Sec., *s.* 273, and cases cited in note.   A municipal corporation, like an individual, is not bound by its subscription, unless the conditions expressed therein are complied with.   Pierce R. R. 99, citing *Bucksport & B. R. Co.* v. *Brewer*, 67 Me. 295; *Virginia & T. R. Co.* v. *Lyon County*, 6 Nev. 68; *Campbell Co.* v. *Knoxville & K. R. Co.*, 6 Cold. 598; *State* v. *Daviess County*, 64 Mo. 30; *Cooper* v. *Sullivan County*, 65 Mo. 542; *Wagner* v. *Meety*, 69 Mo. 150; *Falconer* v. *Buffalo & J. R. Co.*, 69 N. Y. 491; *People* v. *Clayton*, 88 Ill. 45; *People* v. *Waynesville*, 88 Ill. 469; *Parker* v. *Smith*, 3 Brad. (Ill.) 356; *Bittinger* v. *Bell*, 65 Ind. 445; *Merrill* v. *Welsher*, 50 Iowa 61.  These cases, upon examination, seem to be in point.  See, also, *P. & O. Cent. R.* v. *Hartford*, 58 Me. 23, *County of Moultrie* v. *Savings Bank*, 92 U. S. 631, and all the cases referred to in the plaintiffs' brief, where the matter comes in question either directly or incidentally.  It will be observed, that most of the cases to be found in the books are where the vote was to take stock in the corporation, thus giving the city or town a legal interest in the thing their money is used to procure, and a voice in its control and management.   We submit that the broad reasons which have led courts uniformly to treat such provisos as conditions precedent, to

be fully and strictly performed before the city or town can be held to pay, or to issue their bonds, apply with double force here, where the vote was to make a mere gift.

We now call attention to the position of the real plaintiffs before the court. They are not the holders of negotiable bonds seeking the opinion of the court as to the validity of their securities; but they present themselves in the very novel attitude of assignees of the interest or right of the Manchester & Keene Railroad to the gratuity. In fact, they bring their suit in the name of that defunct corporation. No parallel case has been found in the books. The cases are numerous where the question of the validity of bonds issued by municipal corporations in aid of railroads has been discussed; and there is danger, however much we may guard our minds against it, that an analogy will be allowed between those cases and the present, when none at all exists; that we shall unconsciously give way to the feeling that these plaintiffs in interest stand somewhat in the position of holders of negotiable paper, who have paid value for it. The plaintiffs themselves have, we fear, already yielded wholly to this very incorrect view of their situation, and the loud talk of counsel about repudiation would seem to indicate that those gentlemen are in danger of falling into the same mistake. Keene never promised to pay over anything to anybody except the Manchester & Keene Railroad. These gentlemen are volunteers, in every sense of the word. They took from Dawe & Bonnallie the interest which that firm had taken from the M. & K. R. R. corporation in the vote of Keene, because they thought it for their pecuniary interest to do so, because they thought they could make money by doing so. In no possible view can they stand at all better than this bubble of a so called corporation would stand were that legal person the sole plaintiff in interest here. And it will be observed that the assignment to them of the vote was made long before the time when a majority of the referees find that the road was in a condition fit to be used as other new railroads in similar localities have been used.

The plaintiffs in interest claim that the effect of the assignment to them of the pecuniary interest which the corporation had in the vote of Keene was to operate as a full and complete substitution of them for the corporation in all respects; so that Keene having contracted with a certain legal person, which had a well defined and well known character imposed upon it by the law of the land, should be compelled to accept a partial and incomplete performance from another person having a legal character entirely different. This we deny; and we are thus brought to our first point.

I. No substitution of the plaintiffs in interest, or any other natural person in place of the Manchester & Keene Railroad Corporation, with respect to the performance of the contract (calling it a contract), or any part thereof, can lawfully be made either with

or without the assent of Keene. The resolution clearly contemplated that the road should be completed for use by the M. & K. Corporation and by no one else. This unilateral contract, so far as regards the rights and obligations of Keene, was not assignable. The resolution was passed in view of the laws of the state in existence at the time. The duties and obligations laid by law upon either of the parties with respect to the subject-matter of the contract became a part of the contract. In prescribing the general duties of railroad corporations, the legislature were doing no more than marking out and defining the traits, qualities, characteristics, and functions which those artificial persons should possess. It was the creator fixing the character of the thing created. When Keene came to deal with this creation of the legislature, such dealing could not, by any possibility, go on any ground except that the railroad corporation was just the kind of thing which the legislature had made it, subject to all the duties and obligations imposed by the laws of the state on such corporations. This became and was just as much a part of the contract as that Keene was and should continue to be a municipal corporation, capable of exercising just the powers and subject to just the duties by law vested in corporations of that sort. A railroad is good for nothing, to a municipal corporation or to anybody else, unless it is equipped and operated. The law lays upon railroad corporations the duty to equip, maintain, and operate their roads. This is all covered by Gen. St., *c.* 145, *s.* 3. It is a compliance with this law, and not the mere existence of a string of iron rails laid upon the ground, that makes a railroad useful or valuable to the public. Was it necessary that Keene should expressly stipulate in her resolution that this duty, imposed by law upon the creature she was dealing with, should be performed? Most assuredly not. This vital provision of the law became just as much a part of the contract as though it had been written out at length in the resolution. This we regard as too plain, too well understood, too elementary, for a moment's debate. If that be so, where is the power to abrogate and annul that most important part of the contract any more than any other part of it? It certainly does not exist in the court. It certainly does not exist in the parties. Can the court, or the M. &. K. Railroad, or these plaintiffs in interest, do indirectly what the law plainly says neither can do directly? By going through the manœuvre of substituting a legal person who has none of the obligations with respect to equipping, maintaining, and operating the road resting on him, which are imposed by law upon railroad corporations, can this vital part of the contract be evaded, avoided, nullified? We do not believe any such kind of legal jugglery can find countenance. It is a thing that cannot be done even by the assent and concurrence of Keene itself; for the reason that Keene had no lawful power or authority to give any such assent. That this must be so will be plain, we think, upon a

moment's reflection.  By the law of this state "Railroads, being public highways, can be laid out, built, maintained, and put in operation only by virtue of express grants of the legislature, or of authority derived from them."  Gen. St., c. 146, s. 3.  The authority given towns by statute to vote aid to the construction of railroads is by necessary implication confined to such legal persons as may lawfully build railroads; in other words, to incorporated companies, who, in accepting their franchise, assume all the legal obligations imposed by the general laws of the state upon such corporations, as well as those contained in their charter.  The conclusion seems to us inexorable, that inasmuch as Keene could not lawfully have voted the gratuity in the first place to any other person than the legal person having authority by law to build a railroad, she could not afterwards lawfully consent to the substitution of a different person, and one who has not the right to build, maintain, or put in operation a railroad, and is not subject to any of the duties in that behalf provided by the law.

But Keene has not in fact ever assented, or attempted to assent, by any act, or by the omission of any act, to such substitution.

The only significance of the filing of the assignments in the city clerk's office was simply a notice to the city that, as between the assignors and assignees, the latter were entitled to the money or bonds whenever they should be paid over.  But it was no notice of an intention or of an attempt to substitute a natural person having no legal obligation or duty with respect to the maintenance and continued operation of the road, in place of the legal creature with whom they were dealing when they passed the vote, the very vital part of whose organic existence were those very obligations which it is now sought to evade  Should it be said that this objection would be met, and may now be met, by requiring the plaintiffs in interest to furnish security in place of the obligations imposed by law on railroad corporations, which shall put the city in as good position in that respect as though the condition had been performed by the corporation, the answer is, that the court have no power to make such order, because it would be substituting a contract which Keene did not make, and had no legal power or right to make, for the one she did make; or, in other words, abrogating the contract made, and substituting in place of it an arrangement which the court think may afford equal protection to the rights of the parties in another way.

II.  The report shows that the road was not completed for use by anybody within the meaning of the resolution at the date of the writ, and that it has never been so completed.

The report shows that land damages for about 1¼ miles of the road have never been paid; that they were assessed, and tendered in all cases but one; that no part of said unpaid land damages was ever deposited with the state treasurer; and that the corporation has no money or other funds wherewith to pay them.  By inad-

vertence, we suppose, the report does not show, in so many words, that appeals were taken in those cases. This was perhaps thought by the referees to be a sufficiently plain inference from what is stated. In what is said on this point the fact of such appeals will be assumed. Is a railroad in this state completed for use before the right of way has been procured, either by contract with the land-owners, or in the mode prescribed by the laws of the state? Upon this general question I do not know that any difference of opinion exists between the parties. At all events, it seems safe enough to assume that no one will attempt to argue that a railroad which has not the right of way is completed for use.

But at this point we are met by certain facts found, and specially reported by the referees, which facts, they say, in their judgment amount to a " waiver " by the land-owners of their right to dispossess the plaintiffs. Those facts are, that the corporation entered upon the land, built their road, caused land damages to be assessed, tendered them; and that "no land-owner has attempted or threatened to disturb the possession of the plaintiffs, or objected to the plaintiffs' occupying the land taken for the road." The referees call the effect they give to these facts by the name, waiver of right to dispossess the plaintiffs. The effect sought to be given them by the plaintiffs (and this is the only effect which will meet at all the exigencies of their case) is that of an estoppel *in pais*,—an estoppel by conduct, whereby the land-owners have parted with their land to the extent of a perpetual easement in it to be used for a railroad, and the plaintiffs have acquired what the land-owners have thus lost. It makes no difference by what name the referees call the legal effect to be given to these facts; they are before the court, and it is for the court to say whether they show that the corporation has acquired the right of way by reason of the conduct of the parties or not. What have those land-owners done to forfeit and lose their right to the possession and enjoyment of their property? Nobody pretends they have done anything except to refuse the tenders. What, then, have they omitted to do? All that the referees find on the subject of omission is, that no one of them has " attempted or threatened to disturb the possession of the plaintiffs." Hence what they call a waiver. Hence really a new statute of limitations substituted for the comfort and convenience of these plaintiffs in interest for the statute law of New Hampshire. It is inconceivable how a man's silence under these circumstances should lose him his farm.

It certainly seems to us very plain indeed,—very plainly in accord with common-sense, and very plainly in accord with what constitutes a reasonably fair interpretation of a man's conduct,— that the omission of these land-owners to threaten or attempt to disturb ·the plaintiffs, meant, not that they intended to give up their land, but, on the other hand, that they intended by their silence to give the corporation most unequivocally to understand

that if their land was wanted for railroad purposes, it must be taken from them according to the provisions of the law. The referees say, by refusing the tenders and then remaining silent and keeping the peace, they "waived" their right to dispossess the plaintiffs. This, as already suggested, means estoppel, if it means anything that can avail the plaintiffs, whereby the land, or at least the right to its use for a railroad, has passed irrevocably and forever from the owners to the corporation,—an estoppel by conduct, whereby their mouths are forever shut against saying that they have any right of possession in their land except subject to the overwhelming easement. The right to possess and use things, whether real or personal, constitutes the fundamental idea of property in those things; so that, when a man loses, as to himself and his heirs, forever, the right to possess his farm, he has to all practical intents lost his farm. The interest that remains in him, if any, is much more a matter of sentiment than a thing of commercial value. As already suggested, it does seem to us there is no escaping the conclusion that the decision of the referees on this point, giving it the effect which the plaintiffs claim, comes nothing short of an attempt to put their own judgment, as to what ought to be the period of the statute of limitations in this particular case, in place of the time fixed by law; for the facts reported, as it seems to us, do not show one single element to constitute an estoppel which shall have the effect to pass the title to the land, or divest the owner of his right to possess and enjoy it.

What did the corporation do? They went upon the land, as they had a right to do, and located their road. They procured damages to be awarded, and tendered the amount, which, being refused, they put back into their treasury, and it is gone. They omitted the very thing which the law and the courts of this state have always guarded with the most jealous care. They omitted to pay the sums awarded to the state treasurer, and furnish security to the acceptance of the county commissioners for the payment of further damages and costs, as required by Gen. St., c. 146, s. 22. "If the right of acquiring, possessing, and protecting property is a constitutional right, the compulsory taking of the plaintiff's property without payment was an unconstitutional violation of the right, as direct and gross as can possibly be committed. Such a wrong is not an exercise of the power of eminent domain. A compulsory purchase of private property for public use without payment is not a definition of eminent domain, but a florid and periphrastic description of something else. The outrage is not legalized or palliated by the technical, rhetorical, and contradictory description. Calling it a purchase does not make it a purchase. Being compulsory, and being without compensation, it is simply pillage,—an infraction of the constitution as plain as can be conceived of, if the right of acquiring, possessing, and protecting property is a constitutional one." *Orr* v. *Quimby*, 54 N. H. 616.

In the above case, a majority of the court thought the faith of the national government, impliedly pledged to make full compensation for the damage inflicted upon a citizen by the taking of his property for a use as public as the coast survey, was reasonably sufficient security that it would be done, and might safely be allowed the same effect as a deposit of money, or the furnishing of approved security for payment. But no man in that court, or, as we believe, in any other court, ever attempted to question the soundness of the doctrine so forcibly expressed in the observations quoted above from the dissenting opinion of Mr. Justice *Doe.* Never before have we heard it intimated at the bar, or from the bench, that the land of a citizen can be taken from him without his consent, and devoted to a public use in any other way than the way prescribed and pointed out by the laws of the state ; and never before have we heard it suggested from any quarter that the failure of the citizen, by some noisy demonstration of dissent or by a lawless interference with force to prevent the taking, would be followed by the fatal consequence of a loss of his land, not by virtue of a compliance with the requirements of the law by which it may be taken, but by virtue of his own orderly, decent, and peaceable conduct.

Will it be said that the failure of these land-owners to do anything in the way of asserting their legal rights, after the entry to construct and during the period the road has been in use, possesses any greater significance, or can have any greater legal effect, than their failure to interfere by physical force or legal process to prevent the entry? We say no such proposition can for a moment be sustained. There has been no time since the rails were laid down when it would have been wise or proper conduct on the part of one of them to tear up the rails across his land ; and it was never yet heard, in this state at least, that a man's land should be taken from him by the court, and given to another who has no better right to it than that the owner's dread of a lawsuit deterred him, for a period less than the statute of limitations, from commencing legal proceedings for the protection and enforcement of his violated rights. If A, with full knowledge of what is going on, stands by and sees B sell, and in his own name convey, his (A's) land to C, and makes no objection, and gives no sign that the land is his, he cannot afterwards impeach the deed of B to C. He has waived his right to dispossess C of the land. In other words, he is estopped by his conduct from saying that B's deed does not make a good title against him. Have these land-owners done anything of that sort here ? What they saw going on was an apparent attempt on the part of the railroad to get their land condemned to a particular use according to law. There was no call upon them to speak or to act. Their silence misled nobody ; and if it did, had they not a most unquestionable right to remain silent ? What right had the railroad to suppose they were going to get the

land of owners, who did nothing but hold their peace, in any other way than that pointed out by the law? Is the act any the less "pillage" because the victims, believing, and having every reason to believe, that their property is being taken from them by a use of the enginery of the law in such cases provided, do not raise a tempest of utterly vain objection, or resort to physical resistance?

In the early days of railroads in this state, land-owners situated exactly as these are had full legislative authority "to remove the rails from said railroad, fence up the land, and take and retain possession of the same until entire satisfaction is made to the owner or owners of the land thus taken," and this without any preliminary legal process or proceeding for the settling of facts that might be in dispute as to whether the right of way had not been already acquired. Laws Nov. Sess., 1840, *c.* 584, *p.* 504. This was giving to a party in interest rather large powers. It was clothing him with authority to determine in his own case when a mandatory order of that sweeping description should be issued, and putting the order in his own hands for service and execution. It savors rather strongly of a return to primitive methods of protecting and defending rights of property, and so the statute did not long remain upon the book in that shape. But if any one should assume that the real sentiment and spirit which prompted the passage of that law in 1840 have disappeared or abated in New Hampshire, they would fall into a grievous error. So long as the people of the state are fit to be trusted with the maintenance of a government for themselves, the rights of private property will be guarded and protected with most jealous care. The rights of land-owners are as carefully and as fully protected to-day, although in a different way, as they were by the statute of 1840. The legislature has done its duty. It would be a strange spectacle indeed to see its work brought to nought by the ingenuity of a board of referees sanctioned by the court. The case of *McAulay* v. *Western Vt. R. R. Co.*, 33 Vt. 311, is not an authority at all in conflict with these views. Indeed, as we read the case, it has no bearing at all. Without stopping now to explore the broad field presented by the diversity of the constitutions and statutes of the two states, and the spirit of interpretation applied by their respective courts where the rights and powers and obligations of corporations are concerned, it is enough to say that the two cases are so broadly distinguished in their facts that the one has no just bearing at all upon the other. The fact which distinguishes the case thus broadly to our minds is, that in that case there was a contract between the plaintiff and the railroad, executed in writing before the land was taken, whereby the plaintiff agreed to take pay for his land damages in stock of the road. It was a clear and absolutely necessary implication from this that his consent was given to their taking the land. Why agree upon the method of payment for a thing they were not going to have? All that was left

open was the amount of compensation the owner should receive. Mr. Phelps therefore states the question in the case correctly, in his argument for the defendants, to be "whether, if the land-owner waives his right to require payment before the occupation of his land, agrees in writing to look to the company for his damages, when ascertained, in a manner different from the mode of payment prescribed by the charter, and permits the construction of the road over his land meanwhile, he can revoke the license after it has been acted on by the erection of expensive and permanent works, and reclaim the premises."

The court of New Hampshire has not yet, as we understand, gone the length of holding that a parol license to do any act upon land cannot be revoked even after the licensee has expended money in erecting costly structures thereunder. *Cowles* v. *Kidder*, 24 N. H. 364; *Carleton* v. *Redington*, 21 N. H. 293.

That this is a vexed question in other jurisdictions need not be denied. 1 Wash. R. P. 544. There is no view in which that question becomes material in this case, because the general doctrine here and everywhere else is, that a parol license to be exercised upon the land of another is a mere personal privilege, founded in personal trust and confidence, and is not assignable. 1 Wash. R. P. 545, and cases in notes. If, therefore, we should go so far as to concede that the Manchester & Keene corporation did acquire some right here as against the land-owners by way of a license, still, inasmuch as an assignment of everything that ever belonged to that corporation is exceedingly imminent, if it has not already taken place, and inasmuch as such assignment will inevitably, if it has not already, extinguish all possible right that comes by way of parol license, it is impossible to say that the right of way has been acquired in such sense that the road can be called completed for use. A right to use the land over which a railroad has been constructed, which may be extinguished any day by the act of either party, is too precarious to form the basis of a judgment that the railroad is completed for use.

But this is a digression. It makes no difference what niceties we might run into, provided there were anything like a parol license here, because no such thing exists; and we come back to the broad ground upon which we started out, namely, that when the law points out a mode by which the land of a citizen may be taken from him and devoted to the use of another, whether a natural person, or a corporation created by the state, or the state itself, it is only by pursuing that method that the land can be taken. And it is as contrary to reason and justice and common-sense as it is to the analogies of the law, to hold that the citizen, simply by remaining silent, consents to anything, or waives anything, or gives any license, or submits to have an iron padlock put upon his mouth to prevent him from setting up and asserting any of his rights of property which may have been invaded in the pro-

ceeding. It will be observed that in the Vermont case referred to, no question was made but that the land-owner was still entitled to recover his damages; but the exigencies of this case require the court to go very much further before the plaintiff's view can be accepted. Here there is no agreement by the corporation or anybody else to pay, or of the land-owners to accept pay, for the land, as there was in that case. Either the land (or the right to use it forever for a railroad, which comes to the same thing) is gone wholly from the land-owners to the Manchester & Keene Railroad Corporation, or it is not. If it is gone, no obligation rests upon the corporation or anybody else to pay for it by virtue of any provision of the statute, or by any doctrine that we ever heard of to be found in the common law. If the title is not gone, then it is still in the land-owners, and they can most assuredly assert it. It is no answer to say that it is still possible for somebody to acquire the right of way. This might be an answer if the question were whether the road had been put in such condition that it is possible, by some new organization, and some new proceedings hereafter, to complete it for use. But the question is not whether the road can be so completed, but whether it has been so completed as to meet the requirement of the condition precedent incorporated into the resolution whereby the gratuity was granted. As already suggested, we do not understand it to be claimed that the road can be regarded as completed for use, unless it can be held that the right of way has been acquired. Such a position must certainly be untenable. Nobody would claim that a failure to lay the track for any part of the distance would not be a failure to complete the road for use; and if any authority were needed for so plain a proposition as that, it is furnished by the case of *Hodgman* v. *Chicago & St. Paul R'y Co.*, 20 Minn. 59, *et seq.* How does the laying down of a few iron rails compare in importance with the acquisition of the land on which to lay them? One requires simply a little manual labor, and the expense of procuring it; while the other requires the exercise of the highest prerogative of a sovereign state,—the right to take private property for a public use without the consent of the owner, by making him compensation therefor.

We say this railroad was not completed for use December 1, 1878; that it was not completed for use at the date of the writ, and is not so completed now, for the reason that neither the corporation nor these plaintiffs in interest have got the right of way. And we insist upon this as a fatal failure of performance of the condition precedent upon which the gratuity was voted, and therefore as a full answer and an insuperable bar to the plaintiffs' suit.

III. By a right construction of the resolution, it was made a condition precedent that the road should be completed for use on or before December 1, 1878. 1. That all the parties interested so regarded it is sufficiently shown by the report, and was much more fully shown at the trial. The Dawe & Bonnallie contract

showed it.   The enormous struggle to get the rails strung out over the ground before that time, the work being pressed by the plaintiffs in interest nights, days, and Sundays to accomplish that end ; the ridiculous farce of pretending to operate the road a few weeks in the winter following, with one old engine, and one car in one end of which passengers were invited to ride while their baggage occupied the other, both borrowed of the Nashua & Lowell Railroad ; without hand-cars or gravel trains ; and when the condition of the road-bed was such as is described in the report (very mildly described there, as we must say) ; the examination of the road, made by accomplished and disinterested experts employed by Keene, December 5 and 6,—all this shows unmistakably how the matter was then understood by all the parties interested.   We contend that here was a contemporaneous practical construction of the contract by the parties, which ought to have great weight with the court.   *Contemporanea expositio est fortissima in lege.*   2. This is the fair meaning of the resolution, when read in the light of the circumstances under which it was passed.   The vote of the people contained a proviso in these words : "Provided that no part of said sum shall be expended until the city councils of said Keene shall have satisfactory evidence that said road shall be completed between said Greenfield and Keene in a reasonable time thereafter."   The city councils distinctly declare that their resolution is passed "to carry out the popular will, as expressed by the legal voters of the city of Keene, by a majority exceeding a two-thirds vote, at a legal meeting held on the 7th day of November, A. D. 1874."   The popular will, as expressed by the vote, was clear and unequivocal, that the councils should, upon satisfactory evidence, fix the reasonable time within which the road should be completed.   Did the city councils do this, or did they, in plain violation of the instructions by which they profess to be governed, leave the important matter of time wholly at large, and bind the people, against their expressed will, to pay whenever the road should be completed at any indefinite future time ?

In construing the resolution, the court will put themselves as near as may be in the position of the city councils, and, taking into consideration all the circumstances under which their action was had, say what they meant by the language they used. And if the resolution is capable of a construction that shall render the body of it consistent rather than inconsistent with their purpose and intention, expressly declared in the preamble, that construction will be adopted.   Plain men, and very acute business men, on reading the resolution, never seem to have misconstrued its purport, or entertained a doubt but that the provision as to time applied as well to the matter of completion as to the furnishing of guaranty for completion.   And that is the way the resolution reads.   The road was to be completed, or satisfactory guaranties given that it should be completed, on or before December 1, 1878.

The provision as to payment upon furnishing guaranty was inserted to encourage the speedy and vigorous prosecution of the work. No matter how soon the guaranty might be furnished, Keene would then make and deliver the bonds. That such guaranty and prepayment were expected seems to be fairly inferable from the resolution; for the gratuity was voted to "aid in the construction" of the road. No guaranty was given. The construction contended for by the plaintiffs does violence to the declared purpose of the councils in passing it, putting them in the position of disregarding and disobeying the popular will which they say it is their intention to carry out, while it leads, at the same time, to the very improbable result that the city councils would appropriate this large sum of money to aid in building a railroad without any provision whatever as to the time within which it should be built. It is, moreover, so nice that nobody ever discovered it until the ingenuity of the very acute lawyers of the plaintiffs was brought to bear upon it. And even after the discovery it would be lost again, in the plain, ordinary meaning of the words, but for an exercise of the same ingenuity in keeping it in sight. We submit that the fair import of the language in which the whole provision, read together, is expressed, is what we claim, namely, that it must be completed, or a guaranty furnished that it should be completed, by December 1, 1878; and that this construction is fortified and made impregnable, first, by the contemporaneous construction alluded to, and secondly, by the circumstances under which it was passed, the expressed purpose and intent in passing it, and the object had in view by its passage.

IV. Does the report show that the road was "completed for use" on or before December 1, 1878? That is, Is the finding as to its condition at that time equivalent to a finding that it was then completed for use within the meaning of the resolution? We say No. A word of comment on what really appears in the case may be necessary to show the court how the question as to the construction of the phrase "completed for use" is presented at this time for consideration. At the hearing, of course neither party knew what might be the view of the referees on this point. The defendants, from the beginning to the end of the hearing, insisted that the report should contain such specific findings of fact as would fairly present all questions of law involved to the court. And in this view they repeatedly informed the referees and counsel for plaintiffs that they abstained from wasting time by the discussion of legal questions. Among the legal questions supposed to be involved was the true construction of the resolution with reference to the words "completed for use." The position of the defendants was broadly and clearly stated in the opening, and repeated as often as there was occasion, that the words "for use" did not diminish the legal effect of the word "completed" so as to make the expression completed for use mean less than completed; that

if those words had any qualifying effect, it was to enlarge rather than diminish the requirement. To show what the defendants claim now, and as showing at the same time what was claimed by them at the hearing, we shall quote verbatim from notes prepared during the trial, and read in full in the course of the final argument to the referees. We said then, and say now,—"When a railroad may be fairly said to be completed for use is doubtless a pretty broad question, and perhaps in many cases not unattended with difficulty. It requires the exercise of broad and comprehensive judgment,—practical common-sense. It cannot be determined by any one single narrow rule, ordinarily. If there is a piece of road, long or short, not built, that would seem to be conclusive. See Minnesota case. So it would seem, for a like and equally strong reason, that if there is a piece of road over which the corporation have not acquired right to run—but that is a question of law in this case. But when something has been done to the earth by way of preparing it for a track, and the track has been strung out, then there becomes the semblance of a railroad, and more chance for questions. Cases of this kind may be so extreme that we should not doubt or hesitate much: as, for example, the condition of this so called railroad December 1, 1878. Then it may approach what you might call completion from a long ways off, until you get near. At first the question is easy; at last it grows more difficult. Is there any rule? I say No; none except sound judgment and common-sense. What elements must a railroad 'completed for use' possess? What do the words 'completed for use' necessarily imply? Certainly the idea of safety in its use is included. That is perhaps the first idea that occurs to us. But is the idea of safety in use any more controlling than some other qualities? Some things perish with the using. Is a railroad a thing of that kind? Certainly the idea of permanence in the existence and usefulness of a railroad is included in the idea of its completion for use. It is not possible to dissociate the idea of permanence in the use from the idea of completion for use. What would you say of a house, completed for use, when it was completed to that extent only that you might, with extraordinary care, struggle through one winter in it without its falling down upon your head or letting in the storms so as to drive you out, but which had to be reconstructed in substantial parts, and largely added to by you afterwards, in order to be habitable at all? Take a ship completed for use, that by dint of most careful management is made to perform a single voyage and then has to be laid up, abandoned forever, without substantial parts omitted in the construction being supplied : take a machine, designed to last and to be used for many years, that perishes with the using in three months : is or is not the idea of permanence involved and necessarily included in the term completed for use as applied to a railroad? As to economy in use, that is included in what I have said about permanence. Can a thing designed to be used,

and designed to last in such use, be said to be completed for use when it is so faulty, so far from being finished, that it cannot be used as such things are used, and as a railroad is designed to be used, without self-destruction?" The plaintiffs, on the other hand, contended that the words completed for use would be answered by a condition much less complete—further from perfection—than would answer the single word "completed;" that the words "for use" in some incomprehensible way emasculated the word "completed," so that a string of iron rails over which it was possible to get an engine and single car, even though few trips were or could be made without derailment, and the performance was attended with infinite perils, might properly be held to be a railroad "completed for use" because it was in fact used.

The counsel for Keene, during the trial, when the same cases were brought to the attention of the referees which are now quoted from in the argument, repeatedly acquiesced in all then said, and repeatedly observed that they would be content to take the lowest standard set up by any respectable judge or expert, as shown in those cases or elsewhere, as to what would constitute a completed new railroad. And in order that there might be no misapprehension and no slip on this important point, the claim was reduced to writing, and twice read, *in hæc verba*, during the closing argument. Look at it a moment: "To meet the conditions of this resolution, the road must be completed for use, not partially completed, so that the work of completion may be carried on and finished alongside a partial and precarious use for traffic. We do not mean, made to be a perfect railroad. No road probably was ever completed in that sense; but we claim that it must be in a condition such that a fair man, of sound judgment and practical common-sense, one experienced in such things and having no interest in the result, would say it is a completed road, ready for use in the way railroads are ordinarily used for public traffic, the carrying of freight and passengers." At the hearing it did not occur to the counsel for Keene that the finding would be anything else than that the road was or was not completed for use at the several times when the question of completion might be material. But the referees did not find upon that question one way or the other, as regarded the condition of the road December 1, 1878. The finding of the majority is not that the road was or that it was not completed for use at that time, but that it was "constructed," and was reasonably safe, &c. What, then, is the true position of this question, as now presented by the report?

At first sight it would seem that the two findings could not possibly stand together. It would seem that a railroad that is "reasonably safe, fit, and convenient for public use and accommodation" must be in such condition "that a fair man of sound judgment and practical common-sense, one experienced in such things and having no interest in the result, would say it is a completed road,

ready for use in the way railroads are ordinarily used for public traffic, the carrying of freight and passengers." The plaintiffs' counsel will have it that the finding of the majority is equivalent to a finding that the road was completed for use December 1, 1878, when they all say it was in such condition that a fair man, &c., would say it was not a completed road, ready for use, &c. Manifestly this argument convicts the majority of a degree of unfitness for the duty they undertook to perform, which we do not care to characterize in the only words that would fittingly describe it. Be it noted, that we do not argue or charge that the majority of this board were not fair men, or that they lacked in judgment and practical common-sense, or that they had any interest or anything equivalent to an interest in the result. But what we do argue is, that there is no escape from the position in which the plaintiffs' argument leaves them except this, that the added words "as new railroads are ordinarily used in similar localities" were intended to have an exceedingly large qualifying effect on those which precede—so large, indeed, that the conclusion is inevitable that their whole finding, taken together, falls very far short of a finding that the road was completed for use December 1, 1878.

The simple truth is, however, as already stated, that the majority did not find, or intend to find, or to be understood as finding, that the road was completed for use December 1, 1878, or anything like it,—although the language they use, if it came from any other source, might possibly lead one to think it was intended to give a first impression as to its meaning which a more careful study shows it will not bear.

What they say as to its construction and fitness for use at that time is qualified by the phrase "as new railroads are ordinarily used in similar localities," and qualified to such an extent that they all agree the condition of the road was not up to the very moderate and reasonable standard claimed by the defendants. We complain of the use of this phrase by the majority. It is not in the resolution.

The phrase is very vague, loose, indefinite. It gives the court no sure ground upon which it can possibly say that the road was completed for use within the meaning of the resolution. It is certain that the referees, in their own minds, attached such meaning to it by way of qualifying the preceding part of the sentence, that they found a road fit for use in that way, which they say a fair and competent man would say was not completed ready for use. Now it is upon this finding of the referees that the plaintiffs ask the court to adjudge that this railroad was completed for use December 1, 1878. Will the court give to the qualifying words used by the referees the force and meaning and effect which it is self-evident the referees themselves gave to them? If that be done, but one result is possible; for the court can never hold, as we confidently believe, that a railroad which is not so far completed that a fair, intelligent,

experienced, disinterested man would say it is a completed road, ready for use in the way railroads are ordinarily used for public traffic, is completed for use within any fair meaning and intent of this municipal resolution.    Is a railroad running through an agricultural country, as this does (and the court will take notice of the geography of the state), completed for use when it is not fenced? Fencing the road is a thing required by law.  Gen. St., *c.* 148, *s.* 1. In giving construction to the resolution of this public, municipal corporation, is not this public law of the state to be considered? How can it be said that a railroad is completed for use when an important provision of the law, enacted to secure a reasonable degree of safety in its operation, has not been complied with?  But, aside from the statute, it seems to us impossible to hold that a railroad is completed for use before it is fenced.    An accident occasioned by running into a herd of cattle that have strayed upon the track may be just as serious in its consequences as one occasioned by running upon any other obstruction.    And the defect which is likely to result in such an obstruction is just as much a lack of completion, as a defect from which boulders are likely to fall upon the track from the perpendicular walls of the cuts.

Further, we say that if it were possible to hold that the standard claimed by the defendants was too high, the facts reported show that the standard adopted by the referees was very much too low— that is, too low if we assume, as the plaintiffs do, that the whole report taken together shows a finding that the road was completed for use December 1, 1878.   Look at the condition of the road-bed, the cuts, the embankments, the trestles, the settling of the track at the approaches to the trestles, its want of alignment, the want of depots and equipment; consider also how its condition is illustrated by the farcical attempt to run it for a few weeks,— and we submit that enough appears to satisfy the impartial mind that the road was not completed for use.  Surely enough appears to show that it was not in fact used during that winter without infinite peril as well to those who undertook to operate it as to the few who trusted their bodies or their property to be carried over it, as it could not be and was not used for a day without destruction and loss.

*Hersey & Abbott,* for the defendants.   I. By the terms of the resolution of the city councils, the road was to be completed for use by December 1, 1878.   Completion by that time is a condition precedent, to be absolutely and strictly performed by the plaintiff corporation before the defendants can become liable.

II. The time was essential. No completion subsequent to December 1, 1878, can entitle the plaintiffs to recover, and the doctrine of reasonable time does not apply.

III. The road was not " completed for use," within the meaning

of the vote of the city councils, on or before December 1, 1878, as is shown by the findings of the referees.

The first and second propositions are true, because,—(1) The grammar of the vote demands such a construction. The words " on or before the first day of December, A. D. 1878," refer to the words " completed for use " as well as to the guaranty of such completion. The comma after " Keene " is of no significance, and will not be considered by the court in construing the vote. (2) Because they express the intention of the parties. It is obvious that it is not enough in every instance to ascertain the meaning of the parties. It is, however, always true that this is of the utmost importance, and often sufficient to determine the construction. It is not always sufficient, because the court cannot always construe an instrument to mean that which the parties to it meant. But having ascertained in some manner the real meaning of the parties, the court will construe any legal instrument according to that intention, provided it can do so without violence to the rules of language or law. The court has the right to consider, in order to ascertain the intention, the situation of the parties, and the subject-matter of the instrument.

Briefly, the situation of the parties was as follows : The company received its charter July 16, 1864, and for ten years had delayed to build the road, which was to connect Keene with the central portion of the state ; for ten years had been endeavoring to unlock the treasury of the defendant city ; until, at last, wearied by its importunity, a few hundred of her nearly two thousand voters undertook to bind Keene to pay this gratuity on certain conditions, one of which fixed the time within which the road should be completed. " We are tired of waiting ; you evidently cannot build this road without money. However, if you will complete a railroad by December 1, 1878, that will give to us the benefits which we desire, we will pay you this gratuity." What could be more natural and reasonable than this evident desire of Keene's voters to insure the speedy completion of this thoroughfare ? It is true, they erred in supposing the plaintiffs could not do considerable work upon the road without money, as the sequel has shown. But because they so supposed, they committed the more egregious error of voting the gratuity at all. But in the midst of their wildest enthusiasm, they intended to fix, and did fix, what ought to be their bulwark—the time within which the road should be built. But it may be said that this vote of the people, which we admit is not of binding force, has nothing to do with the case. But it does show, when taken in connection with the vote of the councils, the intention of the city. The meaning of the popular vote was, that the city councils should, before any money was paid, have "satisfactory evidence " that the road should be "completed " in a "reasonable time " from said vote. The councils explained that such "satisfactory evidence " should consist either of a road "completed

for use," or a " satisfactory guaranty from responsible persons that it should be so completed," and such " reasonable time" should expire by December 1, 1878.   Both votes were then notified to the plaintiffs, who, thus acting with a full knowledge of the intention and meaning of the resolution of grant, accepted the proposition in it conveyed.   Both parties thus exercised their legal right, and fixed upon the time within which the road must be completed, by their express and intelligent acts, thereby making time of the essence of the proposition, a condition precedent from which must flow all the legal consequences of such conditions, and thereby taking from the court, as they had a right to do, the power to consider any question as to reasonable time, but leaving it to construe the instrument and find its meaning.

The city could not reasonably demand a guaranty for the completion of the road before the time of completion contemplated by the resolution and understood by the parties in case no guaranty were given.   The subsequent acts of the parties show that this was their intention, and the meaning of the resolution.   The plaintiffs acted upon that understanding, as is shown by (1) their various contracts, all demanding completion by that date; (2) the great efforts made under the Dawe & Bonnallie contract to complete the road by that date.   We claim it is fair to infer that this contract was made for the distinct purpose of fulfilling the condition expressed in the resolution, and to carry out the original intention of the parties.   By this contract, and by the singular zeal manifested at the last in the endeavor to run a train over the iron by December 1, 1878, Keene believed, and had a right to believe, that the plaintiffs regarded time as essential.   Keene was thereby confirmed in her construction of the vote, and was led to refuse payment of the gratuity, and so put to the great expense of this trial.   (3) The running of the trains on that date, although the road was in such a dilapidated, dangerous, and incomplete condition as the case shows it to have been.   (4) The demand made upon the city at that time.   (5) By the allegations in the writ and the demand of interest from that time.   The defendants acted upon that understanding, as is shown by their steady refusal to pay this gratuity because the road was not then completed for use.

The doctrine of reasonable time has been applied only in cases of contract where the defendant has opportunity to recoup the damages suffered by delay.   This resolution has not sufficient elements of a contract to give Keene this right.   It offers a gratuity which is wholly due if the conditions precedent have been fulfilled.   Therefore the application of the doctrine becomes unjust.

The cases cited by the plaintiffs are all cases of contract of purchase and sale, and the doctrine of reasonable time was reasonably applied.   In this case, Keene has no remedy for any damages she may have suffered, and the doctrine does not apply.

(6) Because this construction is natural and reasonable. It is the best construction, because it is that which is made by viewing the subject-matter of the contract as the mass of mankind would view it; for (2 Par. Con. 501) " it may be safely assumed that such was the aspect in which the parties themselves viewed it. A result thus obtained is exactly what is obtained from the cardinal rule of intention." The whole contract must be considered in determining the meaning of any of its parts. If the time of completion without guaranty be obscure, then the time of completion with guaranty, as fixed by the parties, may be used to determine the time of completion intended in case no guaranty were given.

The alternative finding of the referees makes it the duty of the court to ascertain the correct standard of " completion for use " contemplated by the vote of the city councils, and involves the legal construction of the words " completed for use." The plaintiffs say these words are " those of the city, and not of the railroad company, and are therefore to be construed strictly against the former and liberally towards the latter." We suppose this statement is founded upon the maxim " *Verba ambigua*," etc. That maxim only applies when the words of the instrument are ambiguous, and is not to be applied until other rules fail and the intention of the parties is not clear. The intention rules in every case when it appears, and the words " completed for use," although those of the defendant city, are not to be construed strictly against it if the intention appear otherwise, but justly and in such a way as to carry out the intention. They are not to be construed against the city because they may bear such construction, when another intention appears. Indeed, they are not entirely the words of the city, because the plaintiffs adopted them and made them their own when they accepted the proposition of the city before commencing the construction of the road.

In construing the words " completed for use," in order to ascertain the correct standard of completion required, the intention of the parties should govern, provided it can do so without violence to the rules of language or law. The standard of completion set up by the vote of the city councils required such a completion as would be beneficial to the city. Such a standard must necessarily and reasonably have been contemplated by the city. Any other standard would have rendered the vote illegal, because the city could not legally have voted away the money of its citizens for that which would confer no benefit upon them. The city could be benefited only by the safe, economical, and permanent operation of the road. For such an operation the gratuity was offered. The completion contemplated was not a temporary completion, nor a completion for further construction, such as the report finds. Such a completion could bring no benefit to the city, and could not reasonably have been contemplated. Nor could it have achieved the object which both parties had in view, to wit, quick and perma-

nent communication between Manchester and Keene. Nor did it achieve that object, because the road ceased to be operated within three months after December 1, 1878, by reason of its bad condition. The object for which the city offered its money must be kept in view, and must bear its weight in the construction of the resolution. A road which should be only so far completed as to be capable of operation for a day, a month, or a year only, could not have been contemplated by the city. The object was a highway of transportation for freight and passengers, one capable of safe use and of economical use; for thus only could the city derive those permanent benefits it had a right to expect and did expect when it passed the resolution, and without providing for which the vote would have been illegal, and of no binding force in any event. These words "completed for use," meaning the same or more than the word "completed" alone would mean, were designed to protect the city against just such a standard of completion as the plaintiffs claim and the referees have applied. Completion does not mean perfection. If it did, then the words "for use" would restrict. Now they may enlarge, and we claim they do enlarge. The city councils added these words to the word "completed," as used in the popular vote, for the express purpose of compelling the plaintiffs to bestow upon the city those benefits which could only arise from permanent and continuous use. The incentive to the vote was just such a use—was a railroad so completed that it could be used as other roads, old and new, are used, and not a railroad whose scattering "sands of life" ran out, and whose numerous boulders of death ran in, within three months after its alleged "opening." The word "use" carries with it the impression of permanency and continuous employment (Webster's Dict.). Further, this was a gratuity, and not a contract whereby Keene was to obtain stock or bonds or anything by which it could exercise any control of the road in the future. Therefore the resolution should be construed liberally in favor of the defendants. But as the incentive to the resolution and the reason of its enactment was the continuous use of the road, standing in the place of the *quid pro quo* of a contract, said use should have a controlling effect upon the construction of the resolution, and in ascertaining the legal standard of completion.

A majority of the referees have found the road completed for use December 1, 1878, because it was reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities. They thereby adopted a standard of completion differing from that claimed by the defendants, as is shown by their alternative finding. The standard was incorrect, because the idea of permanent benefit to the city is entirely left out. A use of the road for a single day without disaster would, under this finding, render Keene liable. And in fact the referees undertake to find the defendants liable because the road was

used without disaster for three months after December 1, 1878, notwithstanding it ceased to be operated by reason of its bad condition,—in other words, its non-completion,—and Keene was thereby deprived of any benefits whatever. The position taken by the plaintiffs, that Keene needed the road as much one or two years after December 1, 1878, as at that time, admits that the reasonably permanent use of the road was the thing demanded, and is inconsistent with the declaration that a road completed for some purposes only will satisfy the demand and requirements of the resolution. The referees had no right to use those vague and dangerous words "as new railroads are ordinarily used in similar localities." Such a claim was not seriously made at the trial by the plaintiffs, nor did the defendants have the least notice that the referees would undertake to set up such a standard. We claim such a standard is incorrect. But if correct, then we are entitled to a further hearing on that point of the finding. What the referees meant by the words "reasonably safe, fit, and convenient," etc., is to be found by their description of the road;—*i. e.*, a reasonably safe, fit, and convenient road, is a road unfenced for 18½ of its 29½ miles in length, and requiring $8,600 to complete in this respect alone; is a road without terminal facilities, and requiring $1,900 to be expended in needed depots along the line; is a road with incomplete trestles, with track out of line and surface at approaches to trestles, with cuts steep, narrow, and without ditches, embankments so slack that a reasonable degree of economy would require, during the year from December 1, 1878, large additions, fills not up to grade, without sufficient ballast, with ties untamped, with some fills so narrow that the ties extended beyond the embankments, with the ends of the trestles settled and liable to settle, with trestles some of whose bents were out of plumb and line, with at least three trestles of a temporary character, with rocks and boulders in the banks of the cuts in such position that there was a probability of their coming down upon the track; is a road which was rendered impassable at various times, and finally closed against traffic, by material from the sides of the cuts and from the ditches crowding in upon the track; is a road on which cars were frequently derailed for reasons which the referees could not discover; is a road which had no right of way over 6,431 feet of its 29½ miles—deficiencies the cost of supplying which would have amounted to the substantial sum of $20,000. This description means just the same thing in the report as the words "reasonably safe, fit, and convenient," etc., and we claim that a road in that condition is not completed, nor completed for use; wherefore a road reasonably safe, fit, and convenient, etc., is not completed, nor completed for use. But if the court should find the standard correct, then we say the finding is not sustained by the facts reported concerning the condition of the road in detail;—*i. e.*, the legal standard is not correctly applied to the facts; the facts were not required to be brought up

to the standard, but the standard was accommodated to the facts —a matter which the court has ample power to revise.

The payment of land damages is a condition precedent to completion for use. The finding of a waiver by land-owners is unsupported by evidence. Even if the finding be justifiable, the referees neglected to find that there was a waiver December 1, 1878, as is evident from the grammar used in their finding. It is important to keep in mind that evidence concerning the condition of the road September 15, 1880, is not necessarily evidence of its condition December 1, 1878. Keene had no need to point out specific defects, nor to express dissatisfaction. The plaintiffs had a condition to perform, and they knew the requirements of that condition, as is shown by the Dawe & Bonnallie contract. And as they offered a railroad much inferior to the railroad called for by that contract, they knew that the condition had not been met, and so substantially admitted in the declaration, to which attention is called. This claim by the plaintiffs is a weak and puerile attempt to shift upon Keene the responsibility of radical deficiencies in construction, which the company knew existed, and for which they alone were to blame. Rather was it the duty of the city councils, for the protection of the citizens of Keene, to refuse payment of the gratuity, until, by the lapse of a reasonable time, they could have "satisfactory evidence" that the permanent and continuous use of the railroad was assured. It was a matter of business, and not of charity. Keene could know whether the condition had been met only by delay. Subsequent events justified that delay. Long before a reasonable time of delay had elapsed, the road ceased to be used by reason of its bad condition caused by defective construction and consequent inability to resist the laws of nature, which railroads, in order to be railroads, have to resist; and if Keene had paid the gratuity in December, 1878, there is nothing to show that the road would ever have been in a condition different from its condition in March, 1879. Keene's only protection was the condition fulfilled, and she had a right to delay payment until she knew whether the condition had been fulfilled.

*Batchelder & Faulkner,* on the same side.

CLARK, J. By the terms of the resolution raising and appropriating the gratuity, it was declared to be appropriated for the purpose of aiding in the construction of that part of the Manchester & Keene Railroad between Greenfield and Keene. The object was to furnish means for building the road, and in order to make it available for that purpose, as the gratuity was not payable until the road should be completed for use, it might, and probably would, become necessary for the corporation to assign it as security to parties who might undertake the construction of the road. Such an assignment was made to Dawe & Bonnallie, who subsequently

assigned to the plaintiffs in interest; and the assignees, having pro ceeded with the work relying upon the gratuity as part payment, bring this action to recover it.    It is reasonable to suppose that such an assignment was contemplated by the parties, and the objection that the road must be completed by the corporation and no one else, and that the gratuity was not assignable, is not sustained.

A majority of the referees find " that on the first day of December, 1878, the railroad of the plaintiff corporation was constructed from Greenfield to the terminus in Keene, and was reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities." Upon this finding of fact, a majority of the referees find " that the railroad from Greenfield to the terminus in Keene was completed for use on the first day of December, 1878 ;" and the question of law is raised whether the standard of completion adopted is the legal standard required by the words "completed for use," in the resolution of the city councils of Keene, raising and appropriating the gratuity to the Manchester & Keene Railroad Company.

A majority of the referees construe .the phrase " completed for use " as meaning such' a degree of completion as would make a railroad " reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities." It is conceded that the words " completed for use " do not call for a perfect railroad ; that no road probably was ever completed in that sense ; but it is claimed that the road must be " in a condition such that a fair man, of sound judgment and practical common-sense, one experienced in such things and having no interest in the result, would say it is a completed road, ready for use in the way railroads are ordinarily used for public traffic, the carrying of freight and passengers." This is the defendants' standard of completion.    Stated as a' legal definition, it is that the railroad must be so far completed as to be ready for use as railroads are ordinarily used for the carrying of freight and passengers.    The qualification, that the question should be determined upon sufficient evidence by an impartial tribunal exercising sound judgment and common-sense, being implied, adds nothing to the legal proposition.    Does the defendants' standard of completion, that the railroad must be so far completed as to be ready for use as railroads are ordinarily used for carrying freight and passengers, import a higher degree of completion than that adopted by a majority of the referees,—that the railroad should be reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities? What is the difference in degree of completion between a railroad ready for use as railroads are ordinarily used for carrying freight and passengers, and a railroad reasonably safe, fit, and convenient for the public use and accommodation, as railroads are ordinarily used.?

In declaring the legal construction of the phrase " completed

for use," the defendants define the word "use" to mean "as railroads are ordinarily used." A majority of the referees define it by the phrase "as new railroads are ordinarily used in similar localities." And the defendants contend that the standard of comparison adopted by the referees is erroneous, because it is limited to new railroads in similar localities. The objection is not well founded. The resolution of the city councils of Keene had reference to a new railroad to be constructed between Greenfield and Keene. The language was used with reference to a new railroad in that particular locality. The parties understood that the railroad to be "completed for use" was a new railroad between Greenfield and Keene, and when such new railroad was "completed for use," the terms of the resolution would be complied with. The finding of a majority of the referees, that the railroad, on the first day of December, 1878, was reasonably safe, fit, and convenient for the public use and accommodation, as new railroads are ordinarily used in similar localities, is in effect a finding that the railroad was reasonably safe, fit, and convenient for the public use and accommodation as a new railroad in that locality; and we think there is no error of law in the standard of completion adopted by a majority of the referees. The determination of the question whether the road was completed for use, necessarily involved a comparison of the condition of the road with the test of completion adopted by the referees. This test was based upon the common knowledge, information, and observation of the referees (*Hayes* v. *Waldron*, 44 N. H. 580, 587), and not upon evidence introduced on the trial, as we understand it; and the phrase "as new railroads are ordinarily used in similar localities" is used by the referees merely as descriptive of the legal standard of completion adopted by them.

The defendants claim that the report of the referees should be set aside, because, as they contend, the facts reported show, as matter of law, that the road was not completed for use; and in the agreement upon this point they rely upon the fact that the corporation had not acquired the right of way over the whole line of the road. The referees report that land damages to the amount of $881, representing 6,431 lineal feet out of 29½ miles, were and still are unpaid, but were all assessed, and the amounts assessed tendered in all cases except one, and in that case the damages were agreed and a partial payment made. No land-owner has attempted or threatened to disturb the possession of the plaintiffs, or objected to the plaintiffs' occupying the land taken for the road. No part of the unpaid damages has been deposited with the state treasurer. There was no evidence of express waiver, but from these facts the referees find that the unpaid land-owners have waived their right to dispossess the plaintiffs.

Payment or tender of the damages awarded to the land-owner is a condition precedent to the right to enter upon the land for the

construction of a railroad, but the provision being for the benefit of the land-owner may be waived by him. *Smart* v. *Portsmouth & Concord Railroad*, 20 N. H. 233, 238. The statute expressly recognizes the right to enter with the land-owner's consent without prepayment. " Damages awarded to any land-owner shall be paid or tendered him, if known and resident in the state, before the proprietors shall enter on his land to make their road, except by his consent." Gen. Sts., *c.* 146, *s.* 20. " If an appeal is taken from the award of damages, the proprietors may enter upon and use the land upon payment of the damages awarded to the owner, or, on his refusal of the same, to the state treasurer, and filing in. his office reasonable security, to the satisfaction of either of the county commissioners, for the payment of any further damages and costs which may be awarded to the land-owner upon said appeal." Gen. Sts., *c.* 146, *s.* 22. The provision for security for the payment of the damages which may be awarded on the appeal being for the protection of the land-owner, may be enforced or waived by him.

It appears that the land-owners had full knowledge of the proceedings of the company in locating and constructing the railroad over their land. In the case where the damages were agreed upon and a partial payment made, the reception of a part of the damages without objection, with knowledge that the plaintiffs were building the road, was evidence of a waiver of the right to insist upon full payment as a condition precedent to the right to enter upon and use the land. In the other cases the damages had been assessed in the statutory mode, and tendered. The fact is not stated in the case, but is admitted by counsel, that appeals were taken in these cases by the land-owners, and that judgment has since been rendered. Meanwhile the road has been built and put in operation, and the fact appears that no land-owner has attempted or threatened to disturb the possession of the plaintiffs, or objected to the occupation of the land taken for the road. Nor does it appear that any land-owner now objects, or claims the right to dispossess the plaintiffs. The proceedings for condemning the land were legal, and the only irregularity suggested is the neglect to deposit the amounts tendered with the state treasurer. It does not appear that the land-owners insisted that the first appraisal should be deposited during the pendency of the appeals, or that they now complain that it was not done. It was in their power to stop the construction of the road and prevent the plaintiffs' entering upon the land for that purpose until the provisions of the statute relating to appeals had been complied with. As they did not choose to insist upon their legal rights, and allowed the plaintiffs to proceed with the construction of the road at a large expenditure of money and put it in operation, whereby the rights of the public have intervened, and in the meantime prosecuted their appeals to final judgment without objection, we think these

facts are evidence sufficient to sustain the finding of the referees that they have waived their right to dispossess the plaintiffs of the land. "A clear acquiescence by the land-owner in the company's taking possession and constructing its works under circumstances making it his duty to resist the entry, if he intended afterwards to set up that it was illegal, will be treated as a waiver. The waiver, however, while depriving him of the right to dispossess the company, does not deprive him of the right to damages under the special remedy." Pierce R. R. 169, 170.

The case of *McAulay* v. *The Western Vermont R. R.*, 33 Vt. 311, sustains this view. *Redfield*, C. J., says,—"In these great public works the shortest period of clear acquiescence, so as fairly to lead the company to infer that the party intends to waive his claim for present payment, will be held to conclude the right to assert the claim in any such form as to stop the company in the progress of the works, and especially to stop the running of the road after it has been put in operation, whereby the public acquire important interests in its continuance. The party does not, of course, lose his right to enforce it in all proper modes. He may possibly have some rights analogous to the vendor's lien in England, and here until the legislature cut it off. But it is certain, according to the English decisions, that he cannot stop the works, and especially the trains upon the road, if he has in any sense, for the shortest period, clearly given the company to understand, either by his express assent or by his silence, that he did not intend to object to their proceeding with their construction and operation."

It is true the plaintiffs have no legal title to the land, although the road was located and the damages assessed in the statutory mode. Payment is essential to the vesting of the title, and upon such payment the right of way will be acquired. The title remains in the land-owner until payment is made, and, although he has waived the right to dispossess the corporation, his right to compensation in the nature of a lien may be enforced against the corporation or their successors. *Drury* v. *Midland R. R. Co.*, 127 Mass. 571. And equity will enforce the land-owner's right of compensation. *Elwell* v. *Eastern R. R. Co.*, 124 Mass. 160. "A court of equity may, upon a bill to enjoin a company which has unlawfully entered upon the permanent occupation of private property for the construction of a railroad without compensation, allow, as incident to equitable relief, and as the alternative of a perpetual injunction, the payment of damages to the land-owner for his entire injury; and the company, upon paying the amount, will have the right of permanent use in like manner as if due proceedings had been had, with the appraisement and payment of damages, as provided by the special remedy." Pierce R. R. 230, 231; *Henderson* v. *N. Y. C. R. R. Co.*, 78 N. Y. 423. Such an exercise of equity jurisdiction secures the rights of the land-owner, the proprietors of the railroads, and the public, and is analogous to that

exercised to protect the rights of a licensee, in cases of a revocation of a parol license to enter on land after expenditures have been incurred on the faith of the license. *Houston* v. *Laffee*, 46 N. H. 505, 508; *Batchelder* v. *Hibbard*, 58 N. H. 269, 270. This principle of equitable relief is recognized in Gen. Sts., *c.* 146, *s.* 27, which provides, " If land occupied by a railroad was not laid out and the damages appraised at the time of its construction, the road shall not be obstructed, but the land may be set off and the damages appraised, as should have been done originally; and the cost of the proceedings shall be assessed by the railroad commissioners and paid by the proprietors of the railroad." Without affirming the constitutionality of this statute, we cite it as indicating the intention of the legislature to guard against the obstruction of railroads when once put in operation.

If a land-owner, after a railroad has been located over his land and his damages assessed, may lie by without insisting upon payment, or other objection, until the road has been constructed not only over his land but over its entire line, and put in operation as a public highway, and then insisting that the entry upon his land was illegal by reason of the non-payment of his land damages, and refusing to accept compensation, maintain an action for the land increased in value by the improvements put upon it, and obstruct the operation of the road, the inconvenience and injury to the public might be very serious. In such a case there is no injustice in restricting the land-owner to a remedy that will give him the value of his land and leave the proprietors of the railroad and the public in the use of the easement. If the land-owners have waived the right to dispossess the plaintiffs, the defendants cannot avail themseves of the objection. Pierce R. R. 163; *Haskell* v. *New Bedford*, 108 Mass. 208.

A substantial compliance with the conditions of the resolution is sufficient. The construction of written conditions should be reasonable and such as will facilitate the object of the enterprise, and should have regard to a substantial compliance with the agreement rather than to a severely literal execution of its terms. *People* v. *Holden*, 82 Ill. 93. A condition, that the road shall be completed and the cars running to a certain place, is complied with by the running of hired cars. *Courtright* v. *Deeds*, 37 Iowa 503. If the state of the road is such that the cars can be run with reasonable safety and regularity, the condition is complied with, although it may not be finished in every particular. *Freeman* v. *Matlock*, 67 Ind. 99; *Ogden* v. *Kirby*, 79 Ill. 555; Pierce R. R. 62, 63.

*Judgment for the plaintiffs on the report, with interest from December* 5, 1878.

STANLEY and SMITH, JJ., did not sit: BLODGETT and CARPENTER, JJ., concurred: DOE, C. J., and ALLEN, J., were of opinion that interest should be reckoned from September 15, 1880.